STATE OF NORTH CAROLINA           IN THE GENERAL COURT OF JUSTICE
                         FILED        SUPERIOR COURT DIVISION
COUNTY OF FORSYTH                          18 CVS 821

                    2018 FEB 14  P 4: 14
SALEM HOMES OF FLORIDA,      )
INC.,                   FORSYTH CO., C.S.C.
                                            )
        Plaintiff,          BY _____    )
                                            )          COMPLAINT
v.                                          )
                                            )
RES-CARE, INC.,                             )
                                            )
        Defendant.                          )

        Plaintiff, Salem Homes of Florida, Inc. ("Salem"), complaining of Defendant

Res-Care, Inc. ("Res-Care"), alleges and says as follows:

        1.       Salem is a corporation organized and existing under the laws of the State of

Florida but with an office and principal place of business in Winston-Salem, Forsyth County,

North Carolina. Salem maintains its books and records in Winston-Salem, North Carolina,

conducts its primary operations out of its Winston-Salem office, receives notices, legal papers,

and payments under the contract described herein in Winston-Salem. Most of the individuals

affiliated with Plaintiff who have knowledge of the facts and circumstances which form the basis

of this Complaint live and/or work in Winston-Salem, North Carolina.

        2.       On information and belief, Defendant Res-Care is a corporation

organized and existing under the laws of the State of Kentucky.

        3.       Salem is the tenant under a certain Lease Agreement of certain real

property located in the State of Florida and operates certain residential facilities

(the "Facilities") for developmentally disabled adults on such real properties.  Salem

leases the Facilities from Clark, Evans & Tate, Inc. ("Landlord") under a Lease

Agreement (the "Lease") which was entered into on or about December 1, 2013.

 4. Res-Care, among its other businesses, is a manager of residential

facilities for developmentally disabled adults.  Res-Care managed the Facilities for

Salem from December 1, 2013 for approximately four (4) years under contract with

Salem pursuant to an Amended and Restated Management Agreement dated

December 1, 2013, a true copy of which is attached as **Exhibit A** and incorporated

herein as if fully set forth (the "Management Agreement"). The Management

Agreement was negotiated over a period of time, including at least two face to face

meetings of the parties in Winston-Salem, North Carolina.

 5. In general terms, Res-Care's obligations under the Management

Agreement, insofar as it relates to the Facilities, involved management of the day-

to-day operation of the Facilities, including hiring, retention, training and payment

of all staff, intake maintenance care of residents, preparation (for approval by

Salem) of the annual and capital budgets, operation of the Facilities in compliance

with those budgets, maintenance of all financial and business records of the

Facilities, and submission to the State of Florida of all necessary records and

reports to ensure qualification for, and receipt of, all reimbursements for Medicare

goods and services provided (as well as private reimbursements).

 6. The Management Agreement provides for the handling of funds and

the order of distribution of such funds, under a priority listing (the "Waterfall"),

which was under the auspices of Res-Care. Res-Care was responsible for

distribution of funds generated by the operation of the Facilities pursuant to the Waterfall.

7.     Over the course of the term of the Management Agreement, Res-Care failed in multiple particulars to honor its obligations under the Management Agreement.  Specifically, and without limitation as to other breaches which may become apparent during discovery, Res-Care has failed:

(a)     To comply with the budgets agreed to on an annual basis between Salem and Res-Care.

(b)     To satisfy requirements of the State of Florida to fund certain expense categories in sufficient amounts to qualify for Medicare reimbursement.

(c)     To pay the Lease obligations of the Facilities pursuant to the Waterfall priority.

(d)     To pay its own management fees only in the proper order of priority relative to other payment obligations, and only after the payment of other senior obligations of Salem set forth in the Waterfall.

(e)     To pay itself funds to return  the working capital advances it had made only as permitted by the Management Agreement.

(f)     To open bank accounts in the name of and for the benefit of Salem and the Facilities, and not to convert funds to accounts under its own name.

(g)     To perform all accounting, bookkeeping and record keeping functions to enable the sale and to meet the financial reporting, record keeping, and

3

budgetary requirements of the lease and all applicable statutes, rules or regulations of government entities on an annual basis.

      (h)    To prepare and submit to Salem a draft annual budget and capital expenditure budget.

      (i)    To obtain approval of its proposed budgets from Salem, and then follow the provisions of that budget once approved by Salem.

      (j)    To prepare monthly statements of operations and combine monthly statements of operations and submit them to Salem in accurate form within 30 days after the end of each month.

      (k)    To maintain a complete and accurate general ledger recording and summarizing the transactions of the Facilities.

      (l)    To manage Salem's operation of the Facilities in accordance to Salem's obligations under the Lease and applicable law, and to perform its duties under the Management Agreement in a manner to cause Salem's compliance with its obligations under the Lease and applicable law, including state and federal permitting, Certificates of Need, and occupancy laws and regulations for group facilities.

      (m)    To represent Salem in any and all proceedings or appeals of (i) Medicaid rate adjustments of determinations before any governmental agencies, or (ii) ad valorem tax liabilities or valuation determinations.

      (n)    To arrange for architectural, engineering and construction services in connection with any and all capital improvements to such Facilities and

BTM:699718v2

to oversee on behalf of Salem the construction of all capital improvements, including ensuring that each Facility operated by Res-Care pursuant to the Management Agreement is operated in compliance with state and federal law.

(o)     To distribute funds only consistent with the provisions of Section 4 of the Management Agreement, including the Waterfall, and to refrain from prioritizing payments for its own benefit ahead of priority payments due to others.

(p)     To file all of its cost reports in a manner consistent with the terms of the Management Agreement, but in all cases in compliance with applicable law and the rules and regulations applicable to the facilities.

(q)     Following termination of the Management Agreement, to pay any accrued management fees and or advances by Res-Care only pursuant to the termination provisions of the contract (calling for such payments to be paid over a 24-month period following termination or election not to renew by Res-Care.)

(r)     Following termination of the Management Agreement, to cooperate at termination fully with Salem in effecting orderly transition to avoid any interruption in rendering the above described services.  Specifically, and without limitation, Salem is informed and believes that Res-Care submitted to the State of Florida a letter with scandalous, misleading, and/or fraudulent allegations regarding the operations and financial management of the Facilities, thereby placing Salem's operations and reimbursements at risk.  Alternatively, to the extent any such allegations set forth in such letter are accurate, such matters are the

5

direct and consequential result of Res-Care's misconduct in its performance under the Management Agreement.

8.     When the Management Agreement was terminated as of December 31, 2017, without authorization and in contravention of the terms of the Management Agreement, Res-Care swept all funds from all of Salem's accounts maintained by Res-Care pursuant to the Management Agreement and converted the funds to its own use, in direct contravention of the Waterfall and the terms of the Management Agreement.

9.     ResCare has failed to properly account for all funds and assets belonging to Salem within Res-Care's custody and control.

## FIRST CAUSE OF ACTION:
## BREACH OF CONTRACT

10.     The allegations contained in the preceding paragraphs are repeated and re-alleged as if fully set forth.

11.     Defendant is in breach of its contract with Plaintiff.

12.     Plaintiff has been damaged by Defendant's breach of contract in an amount to be proven at trial, but expected to be in excess of $20,000.00.

## SECOND CAUSE OF ACTION:
## ACCOUNTING OF PROFITS AND USE OF ASSETS

13.     The allegations contained in the preceding paragraphs are repeated and re-alleged as if fully set forth.

BTM:699718v2

14.     Plaintiff is entitled to a full accounting of all funds and assets controlled by Res-Care under the Management Agreement.


### THIRD CAUSE OF ACTION:
### CONVERSION

15.     The allegations contained in the preceding paragraphs are repeated and re-alleged as if fully set forth.

16.     Res-Care has converted assets which properly belong to Salem to its own use.

17.     Plaintiff has been damaged by Defendant's conversion in an amount to be proven at trial, but expected to be in excess of $20,000.00.


WHEREFORE, Plaintiff requests  and prays for the following relief:

1.     That the Court order judgment in favor of Plaintiff against Defendant in an amount to be proved at trial but expected to be in excess of $20,000.00.

2.     That the Court require that Defendant give a full accounting of all sources and uses of funds.

3.     That the Court tax all of the costs of this action against Defendant; and

4.     That the Court award such other and further relief as the Court deems just and proper.

BTM:699718v2

This 14th day of February, 2018.

Peter J. Juran
N.C. State Bar No.13566
*Attorney for Plaintiff*

**OF COUNSEL:**
BLANCO, TACKABERY
  & MATAMOROS, P.A.
P.O. Drawer 25008
Winston-Salem, NC 27114-5008
Telephone (336) 293-9000
Facsimile (336) 293-9030

8

BTM:699718v2

## AMENDED AND RESTATED MANAGEMENT AGREEMENT

**THIS AMENDED AND RESTATED MANAGEMENT AGREEMENT** ("**Agreement**") is made on the day and year set forth below, by and among **SALEM HOMES OF FLORIDA, INC.**, a Florida corporation ("**Salem**") and **RES-CARE, INC.**, a Kentucky corporation qualified to do business in Florida ("**Res-Care**").

### RECITALS:

A.    Salem operates fourteen (14) six (6) bed ICF/DD (each such ICF/DD is hereinafter referred to individually as a "**Facility**" and collectively as the "**Facilities**").

B.    Res-Care, through the management and operation of numerous ICF/DD in various other states, as well as its management and operation of the Gainesville group homes in Florida and the Facilities for the prior provider, Salem Villages MRDD, Inc. ("**MRDD**"), has acquired experience in the provision of residential service for the developmentally disabled.

C.    Salem leases the Facilities from Clark, Evans & Tate, Inc. (the "**Landlord**"), pursuant to a certain Lease Agreement ("**Lease**").

D.    Salem desires to retain Res-Care for the provision of specific management services necessary for operation of the Facilities and Res-Care desires to continue to provide such assistance.

**NOW, THEREFORE,** the parties hereto, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, agree as follows:

1.    **Salem as Provider.** Salem shall be considered the official provider of record for Medicaid purposes and shall hold all authorizations and licenses necessary or incidental thereto with respect to the Facilities. Salem shall at all times exercise control over the assets and

EXHIBIT
A

operation of the Facilities. It is understood and agreed that the relationship between the parties hereto is that of independent contractors, and nothing herein contained shall be deemed to create or authorize the creation of the relationship of partnership or joint venture between said parties.

2.   **Res-Care's Obligations.** Res-Care shall assume day-to-day operational responsibility for each Facility and shall perform the following specific management services for Salem:

(a)   Manage the Facilities so as to provide a level of care that meets all state and federal licensing, accreditation and reimbursement standards applicable to an ICF/DD facility, which care shall include the providing or monitoring of the following for the individuals residing in the Facilities:

(i)   the medical and psychological condition of the individuals, including maintenance of medical records where applicable;

(ii)   the activities, both personal and familial, of the individuals;

(iii)   the dietary requirements of the individuals;

(iv)   physical therapy and day program participation by the individuals; and

(v)   the quality of life of the individuals.

(b)   Provide care and treatment to all individuals, protecting their rights pursuant to applicable state and federal law, including laws pertaining to safe-guarding and accounting for personal funds.

(c)   Maintain each Facility and its premises in good and satisfactory condition, all in accordance with such obligations of Salem under the Lease.

(d)   Provide adequate qualified staff for each Facility. At Res-Care's option, such staff may be its employees or may be independent contractors. Provided it is complying

2

with its obligations under this Agreement, Res-Care shall have full authority to hire and fire such staff. Res-Care covenants that it shall not discriminate against any member of such staff, or applicant therefor, because of race, religion, color, national origin, sex, handicap, military status or age, all in accordance with applicable law.  Without Salem's prior written consent (which shall not be unreasonably withheld or delayed), Res-Care shall not terminate the Executive Director of the Facilities or hire any replacement thereof.  Additionally, Res-Care agrees that the Executive Director and the Business Manager of the Facilities shall work exclusively on behalf of Salem with respect to the Facilities, except that such individuals may, with the prior written consent of Salem, which consent shall not be unreasonably withheld or delayed, be assigned to provide temporary services (for a period or periods not exceeding an aggregate of ten (10) working days during any twelve (12) month period) to other operations of Res-Care and its affiliates as reasonably necessary (as for example in the event of disruption of such other operations due to weather or other unforeseen circumstances), provided qualified personnel at the Facilities can temporarily perform such individual's functions during such period.  For any period such individuals are assigned to such temporary services, Res-Care shall not charge the Salem Account for the prorated salary and benefits of such individuals.

(e)     Subject to the limitations of **Section 5**, purchase in Salem's name and behalf, necessary equipment, furniture and fixtures for each Facility.

(f)     Subject to the limitations of **Section 5**, contract, in Salem's name and behalf, for services with vendors or service providers as necessary for the operation of each Facility, including the authority to amend, modify or terminate such contracts.

(g)     Utilize a set of operational policies for the Facilities and submit that document to Salem for its review and approval. Said policies shall meet all licensing and accreditation standards required of ICF/DD group homes by Florida or the federal government.

3

(h)    Perform all accounting, bookkeeping, and recordkeeping functions to enable Salem to meet the financial reporting, recordkeeping, and budgetary requirements of (x) the Lease and (y) all applicable statutes, rules or regulations of governmental agencies. All such reporting and recordkeeping shall be maintained on a calendar year, accrual basis. The annual audit of the books and records of the Facilities shall be performed by an independent certified public accounting firm selected by Salem. The accounting services to be performed by Res-Care or under Res-Care's supervision shall include the following:

(i)    No later than forty-five (45) days before the end of each calendar year, Res-Care shall prepare for Salem a draft annual budget (the "**Budget**") for Salem's review and prior approval covering the operations by Salem of and proposed capital expenditures to be made by Salem with respect to the Facilities for the next calendar year as follows:

(A)    A capital expenditure budget outlining a program of capital expenditures and major repairs as Res-Care reasonably believes will be required for the next calendar year, in which each proposed expenditure will be designated as either mandatory or desirable. Salem may approve or reject, in its reasonable discretion, each proposed capital expenditure. However, Salem shall not refuse an expenditure designated "mandatory capital expenditure" when such refusal would result in the respective Facility losing its license or becoming ineligible under any third party payor program applicable to the Facilities.

(B)    A budget setting forth an estimate of consolidated operating revenues and expenses of the Facilities for the next calendar year  together with an explanation of anticipated changes in Facility utilization, charges to residents, payroll

4

rates and positions, non-wage cost increases, and all other factors offering significantly from the current year.

(C)    A projection of cash receipts and disbursements for the next calendar year based on the proposed operating and capital budgets, together with recommendations as to the use of projected cash flow in excess of short-term operating requirements and/or as to the sources and amounts of additional cash flow that may be required to meet operating requirements and capital requirements.

At Res-Care's discretion, Res-Care may submit one or more revised Budgets to Salem during any calendar year, together with a written explanation of the basis for any modification from the Budget previously approved by Salem. Salem shall not unreasonably withhold or delay its approval of the Budgets (including any revised Budget) submitted by Res-Care. Unless and until a revised Budget is approved by Salem, Res-Care shall continue to operate the Facilities in accordance with the Budget previously approved by Salem.  Subject to **Section 2(r)**, the parties acknowledge and agree that revenues and expenditures with respect to the Facilities may vary with respect to categories or line items and amounts from month-to-month and that the Budget is a projection of aggregate revenues and expenditures for the entire calendar year.

(ii)    The preparation of a monthly statement of operations for each Facility and a combined monthly statement of operations for the Facilities to be submitted to Salem within thirty (30) days after the end of each month.

(iii)    The maintenance of all records for resident billing, billing for all accounts receivable and (to the extent practicable without undue expenditure of funds) collection of same.

(iv)     The maintenance of all records for accounts payable and the payment of the same.

(v)      The preparation of all necessary Medicaid and other third party payor reports.

(vi)     The preparation of all necessary reports and returns for all sales, use, ad valorem and occupancy taxes.

(vii)    The maintenance of a complete general ledger recording and summarizing the transactions of the Facilities.

(viii)   The maintenance of detailed records of all funds as required by the Lease.

(i)      Res-Care shall use its best efforts to operate the Facilities in accordance with the provisions of the Budgets submitted to and approved by Salem.

(j)      Subject to the limitations of **Section 18**, represent Salem in any and all proceedings or appeals of (i) Medicaid rate adjustments or determinations before any governmental agencies, or (ii) ad valorem tax liabilities or valuation determinations.

(k)      Manage Salem's operation of the Facilities in accordance with Salem's obligations under the Lease and applicable law, and to perform its duties under this Agreement, unless otherwise directed by Salem, in a manner to cause Salem's compliance with its obligations under the Lease and applicable law.  Except as set forth in **Section 5**, Res-Care shall have no obligation to pay any Costs of Operation or make repairs, renewals or replacements, or make any payments under the terms of the Lease except from Salem's funds. Nothing herein shall constitute a guarantee by Res-Care that the Facilities, whether individually or collectively, will be able to meet any rate covenants set forth in the Lease or any other level of financial performance.

(l)     Attend not more than quarterly meetings of the Board of Directors of Salem (and such meetings of committees of such Board as Salem may reasonably request) for the purpose of providing information and advice concerning the management of the Facilities. The reasonable out-of-pocket cost of attending any such meetings shall be deemed a part of the Costs of Operation.

(m)     Arrange for architectural, engineering, and construction services in connection with any and all capital improvements to such Facility, and to oversee on behalf of Salem the construction of such capital improvements.

(n)     Provide online access to Salem's designated employees with respect to the Salem Account (as defined in **Section 4**) and the general ledger of the Facilities maintained by Res-Care, together with access to such other financial information with respect to the Facilities as requested by Salem from time to time, including providing Salem with read-only access to select financial reporting so as to enable Salem to access various financial information which is customarily kept by Res-Care in the ordinary course of business, including, without limitation, the information described in **paragraph (r)** of this **Section 2**.

(o)     Res-Care, without the prior written consent of Salem (which may be withheld in its sole discretion), shall not create, assume or suffer to exist any deed of trust, mortgage, voluntary or involuntary lien, whether statutory, constitutional or contractual (except the lien for ad valorem taxes on the Facilities which are not past due), security interest, encumbrance or charge, or conditional sale or other title retention document, against or covering all or any portion of any Facility.

(p)     Res-Care shall not use, generate, manufacture, treat, store, recycle, transport, dispose, spill, leak or release, or permit any other person to use, generate, manufacture, treat, store, recycle, transport, dispose, spill, leak or release any hazardous substance in, on or

7

under any Facility, except in compliance with all applicable environmental laws and other applicable federal, state and local laws, rules, regulations, ordinances and requirements.

(q)     Notwithstanding any provision to the contrary in this **Section 2** or elsewhere in this Agreement without the prior written consent of Salem, Res-Care shall have no responsibility or authority to negotiate, execute or deliver any lease, contract or other agreement, or to take any other action, for or on behalf of Salem, or which legally binds Salem (the foregoing shall not limit the ability of Manager to enter into contracts in the name of any Facility for which Res-Care alone shall be liable), unless it:

(i)      is terminable by Salem without premium or penalty by not more than thirty (30) days' notice; or

(ii)     is in the ordinary course of business consistent with past practice and contained within the Budget.

(r)      Within ten (10) business days after the last day of each calendar month during the Term, Res-Care shall notify Salem that it has made available online to Salem (i) detailed information regarding all of the foregoing for the preceding calendar month for the operations: Costs of Operations, billings, collections, bad debts and capital expenditures; (ii) all balance sheet information regarding the operations, including without limitation, accounts receivable and accounts receivable aging; and (iii) an executive summary of the financial information and the operations of the Facilities for such month, including comparisons to the Budget, explanations of any material variances to the Budget, and projections of anticipated future variances to the Budget. Not later than the third business day after such information is made available to Salem, representatives of Salem and Res-Care shall confer by telephone to discuss such information, Res-Care's analysis of the same and any objections that Salem may have (it being understood that a one-time (not continuing) monthly variance of less than five

8

percent (5%) from the Budget, both by category and in the aggregate, and monthly variances that Res-Care can reasonably demonstrate will be reversed within the calendar year, shall not normally be objectionable; provided, larger variances which have been previously discussed with, and approved by, Salem shall not be objectionable nor shall variances which result from unanticipated disruptions in the timing of receipt of revenues (so long as such disruption is not the result of a breach by Res-Care hereunder), but which are not expected to result in a variance to the annual Budget, shall also not be objectionable).  Not later than two (2) business days after such telephone conference, Salem shall advise Res-Care in writing either (x) that Salem has no continuing objections, or (y) that Salem has continuing objections, and if so, Salem shall identify the same.  If Salem has no objections, the revenues and expenditures for such month shall deemed to be in compliance with the Budget for all purposes.  To the extent that Salem has any continuing objections, Res-Care and Salem will jointly discuss and agree to actions to be taken, including, without limitation, as appropriate, additional efforts to collect receivables, adjustments to Operating Expenses, or adjustments to the Budget.  Any adjustments to the Budget shall be considered an amendment to the Budget as previously approved under **paragraph (i)** of this **Section 2**. In Salem's discretion, the information, analysis and review described in this **paragraph (r)** may by provided and performed on a quarterly, rather than monthly, basis.

(s)     Res-Care will file all of its cost reports in a manner consistent with the terms of this Agreement, but in all cases in compliance with applicable law and the rules and regulations applicable to the Facilities.

3.     **Salem's Obligations.** The obligations of Salem shall consist of the following:

(a)     To furnish general policy and procedural guidance and direction for the operation of the Facilities.

9

(b)    To examine, observe, and inspect the Facilities, and any and all records and reports applicable thereto and to the services and functions of Res-Care.

(c)    To assist in the preparation of, and to approve, the Budgets and annual plans submitted by Res-Care for the operation of the Facilities, which approval shall not be unreasonably withheld.

(d)    To establish operating policies, standards of operation, admission policies, standards of service and maintenance and resident rates and other charges for the Facilities' residents. Salem shall fix, collect, and charge such rental rates and other charges as required to pay timely all Costs of Operation (as defined below), the Management Fees and all obligations of Salem pursuant to the Lease, and shall use its best efforts to operate the Facilities in accordance with the Budgets submitted to and approved by it. Further, Salem covenants and agrees to comply with all of its obligations set forth in the Lease without limitation on Res-Care's contractual obligations to effect such compliance on Salem's behalf.

(e)    To establish policies affecting the Facilities or the operation thereof which are not inconsistent with the responsibilities assigned to Res-Care under the terms of this Agreement.

(f)    To play an active role in promoting the good will and public image of the Facilities, their residents and Res-Care.

(g)    To cooperate with Res-Care in executing all forms and returns required pursuant to applicable taxing statutes, rules and regulations and governmental reimbursement programs.

4.    **Revenues, Costs of Operation and Management Fees.**

(a)    All revenues from operations of, or any interest earned on any deposits or accounts maintained under this Agreement for, the Facilities (collectively, **"Revenues"**) shall be

deposited into, and all Costs of Operation (and all capital expenditures) paid out of, a bank account in Salem's name at a financial institution selected by Res-Care and approved by Salem (the "**Salem Account**"), which approval shall not be unreasonably withheld for the payment of the following items on a monthly basis in the following order of priority: (i) the Costs of Operation (in accordance with the priorities set forth in **Section 4(b)**); (ii) any outstanding cash advances made by Res-Care paid or incurred by Res-Care for the Facilities and normal working capital advanced by Res-Care pursuant to **Section 5**; and (iii) any outstanding cash advances made by Salem, Res-Care, or any other person or entity, *pari passu*.

(b)     The Costs of Operation shall include: (i) (A) all costs and expenses incurred in the operation and management of the Facilities including matters herein referred to as Res-Care's responsibility, including but not limited to any salary, compensation or payments to staff for each Facility and the costs of repairs to, and maintenance of, the Facilities (but not the cost of capital improvements or capital assets), (B) rent for the Facilities in the amount of Twenty-Five Thousand Eight Hundred Seven and 30/100 Dollars ($25,807.30) per month ("**Rent**") (which shall be paid no later than the first business day of each calendar month), (C) all premiums or charges for insurance coverage with respect to the operations of the Facilities, (D) expenses and costs incurred in connection with the purchase of necessary supplies, the furnishing of utilities to the Facilities and other necessary supplies furnished by independent contractors, (E) the cost to Salem of its annual inspection of the Facilities (not to exceed Five Hundred and 00/100 Dollars ($500.00) for each Facility), (F) any audit adjustments or payments required in connection with or as a consequence of any proceeding or appeal described in **Section 2(j)**, (G) any ad valorem taxes payable with respect to the Facilities, (H) any payments under that certain Promissory Note dated December 1, 2013 payable from Salem to Res-Care in the amount of Two Million Seven Hundred Fifty Thousand and 00/100 Dollars ($2,750,000.00)

11

(the "**Note Payable**"), (I) home office expenses of Twenty-Two Thousand and 00/100 Dollars ($22,000.00) payable monthly to Landlord, and (J) Salem's monthly installment on its note payable (the "**Delinquent Rent Note Payable**") to Landlord in connection with its assumption of MRDD's delinquent rental obligation due to Landlord (Items A-J in this clause (i), collectively, the "**Priority Costs of Operation**"); and (ii) (A) the Management Fees (as defined in **Section 4(d)**), (B) any interest payable on any advances by Salem, Res-Care (exclusive of the Note Payable), Landlord, or to any other party, (C) home office expenses of Twenty-Two Thousand and 00/100 Dollars ($22,000.00) payable monthly to Salem, and (D)  Seventeen Thousand and 00/100 Dollars ($17,000.00) payable monthly to Salem for its home office personnel expenses (Items A-D in this clause (ii), collectively, the "**Secondary Costs of Operation**") (with each item of Secondary Costs of Operation paid concurrently, to the extent of available funds, on or before the first business day of the succeeding calendar month). Notwithstanding the foregoing, amortization of deferred expenses and depreciation shall not be included in the Costs of Operation. On a monthly basis, all Priority Costs of Operation shall be paid before any Secondary Costs of Operation are paid. If sufficient funds are not available in the Salem Account during any calendar month to pay all of the Secondary Costs of Operation for such calendar month or any prior calendar months, then such amounts shall be paid on a basis which is proportionate to the total amount of Secondary Costs of Operation owed to each party for such calendar month or any prior calendar months.  All payments due to Salem with respect to the Costs of Operation shall be paid via wire transfer to a bank account designated by Salem, which bank account shall be under the sole control and custody of Salem.

(c)      [INTENTIONALLY OMITTED]

(d)      The Management Fee shall be paid to Res-Care, and the home office expenses shall be paid to Salem, in accordance with the terms of this **Section 4(d)**.  Subject to

adjustment as provided in this paragraph, the Management Fee payable to Res-Care shall initially be Five Thousand Three Hundred Four and 18/100 Dollars ($5,304.18) per Facility per month. Notwithstanding any provision in this **Section 4(d)** to the contrary, if all or any portion of Res-Care's Management Fee payable under this **Section 4(d)** shall be disallowed as a reimbursable cost as a consequence of any proceeding or appeal described in **Section 2(j)(i)** and either the amount disallowed is recouped against billings or accounts receivable from the Facilities or Salem is required to repay the amount so disallowed (in each such instance, a **"Res-Care Disallowed Amount"**), the Management Fee payable shall be reduced to the level determined to be allowable, effective as of the effective date of such disallowance and the Management Fee otherwise payable after the date of receipt of the notice of such disallowance shall be withheld until the amount so withheld equals the Res-Care Disallowed Amount. If any expenditure for the Facilities is disallowed as a reimbursable cost as a consequence of any proceeding or appeal described in **Section 2(j)(i)** by reason of lack of documentation, Res-Care shall pay the amount of such disallowed expenditure to the Salem Account.  Notwithstanding any provision in this **Section 4(d)** to the contrary, if all or any portion of (i) any payments on the Delinquent Rent Note Payable, (ii) the home office expenses paid to Landlord as provided in clause (i)(I) of **Section 4(b)**, (iii) the home office expenses paid to Salem as provided in clause (ii)(C) of **Section 4(b)**, or (iv) the home office personnel expenses paid to Salem as provided in clause (ii)(D) of **Section 4(b)** (the payments described in clauses (i) through (iv) being referred to as the **"Salem Payments"**), are disallowed as a reimbursable cost as a consequence of any proceeding or appeal described in **Section 2(j)(i)**, and either the amount so disallowed is recouped against billings or accounts receivable from the Facilities or Salem is required to repay the amount disallowed (in each such instance, a **"Salem Disallowed Amount"**), the Salem Payment so disallowed shall be reduced to the level determined to be allowable, effective as of the effective

13

date of such disallowance, and either (A) to the extent that all of the amounts otherwise payable under **Section 4** have been paid and there is cash available in the Salem Account to pay in full the Salem Disallowed Amount, no additional reduction of the Salem Payments shall be made, or (B) to the extent that such recoupment or payment obligation attributable to a disallowance of a Salem Payment shall result in a shortfall in the payment of all of the Costs of Operation, such shortfall shall not be applied on a prorata basis as provided in **Section 4(b)**, but rather shall be applied solely to reduce the Salem Payments in the month ending after the date of receipt of the notice of such disallowance and succeeding months in an aggregate amount equal to such shortfall. The Management Fee and the home office expenses payable to Salem shall be further adjusted every twelve (12) months by a percentage proportionate to any adjustment for inflation or cost of living applied by the Florida Medicaid program or its successor with respect to costs utilized for purposes of determining applicable Medicaid rates for such year. In the event one or more of the Facilities shall no longer be operated under this Agreement, the Management Fees payable under this Agreement shall be reduced by excluding each such Facility from the calculation of the Management Fees, commencing with the calendar month following the cessation of such operation.

(e)      To the extent amounts available in the Salem Account in any month are not sufficient to pay in full the Management Fees, home office expenses and home office personnel expenses, any unpaid Management Fee, home office expenses and home office personnel expenses shall accumulate interest at a rate equal to the prime rate (as established from time to time by Bank of America) plus two percent (P + 2%) (the "**Advance Rate**"); provided, however, that in the event the Advance Rate exceeds the rate allowable for reimbursement under the Florida Medicaid system, the interest rate shall be such allowable rate, commencing as of the

14

last day of the month such fees become payable, and such past due fees plus accumulated interest thereon shall be paid when revenues are sufficient to do so.

      (f)     Based upon the needs of Salem, the expertise of Res-Care and the services to be provided by Res-Care, it is agreed and understood by the parties hereto that the Management Fee payable to Res-Care will be allocated among the various services provided by Res-Care as follows:

      (i)     managerial review, coordination and control services, twenty-five percent (25%);

      (ii)     personnel services, twenty-five percent (25%);

      (iii)     quality control services, thirty percent (30%);

      (iv)     legal and risk management services, ten percent (10%); and

      (v)     financial services, books and records, ten percent (10%).

Additionally, based upon the needs of Salem, the expertise of Salem and the services to be performed by Salem, it is agreed and understood by the parties hereto that any management fee payable to Salem will be for home office expenses.

      (g)     Within twenty (20) days of each calendar quarter end commencing with the fifth (5th) calendar quarter of the Term, so long as all amounts otherwise previously payable under Section 4 have been paid and the balance of the Salem Account exceeds $500,000 (the "Distribution Threshold"), at the written request of Salem, not later than twenty (20) days after the end of such calendar quarter, all of any portion of such excess over the Distribution Threshold shall be paid via wire transfer to a bank account designated by Salem, which bank account shall be under the sole control and custody of Salem.

      5.     **Capital Improvements and Working Capital.** To the extent not prohibited by law or the Lease, Salem shall have the obligation of advancing funds for all capital assets

(including personal property and equipment) and improvements to the structures of the Facilities required by the rules and regulations of any governmental authority, and required to maintain the operating licenses of the Facilities and the certification and provider agreements for the Facilities under the currently existing Medicaid programs or substitute subsidy programs selected by Res-Care. Subject to Salem's prior written consent, which shall not be unreasonably withheld, Salem shall be obligated to advance funds for such capital assets or improvements required for the efficient operation of the Facilities and to maintain the Facilities in good condition competitive with the standards and quality of other similar facilities.

Res-Care is hereby authorized to incur expenses and liabilities in the ordinary course of rendering the services described in accordance with the Budget and to purchase individual capital items necessary for each Facility but which are not set forth in the Budget which do not have a cost in excess of Ten Thousand and 00/100 Dollars ($10,000.00) per item or Fifty Thousand and 00/100 Dollars ($50,000.00) in the aggregate. Any other expenditures shall require the prior written consent of Salem, which shall not be unreasonably withheld. The determination of whether an expenditure constitutes a capital item shall be made in accordance with generally accepted accounting principles.

Salem shall be obligated to provide all working capital required to pay timely all Costs of Operations, and all obligations of Salem pursuant to the Lease. Res-Care shall not be obligated to provide any working capital for the operation of the Facilities; provided, unless Salem has caused an Event of Default to then exist, Res-Care shall from time to time advance to Salem whatever amounts are required subject to a maximum outstanding principal amount equal to two (2) months of operating expenses for the Facilities (which amount shall include any advances described in **Section 4(a)(ii)**) to pay Salem's Cost of Operations; provided, further, that to the extent that Salem shall have received one or more distributions of cash from the Salem Account

16

within the preceding twelve (12) months pursuant to **Section 4(g)** (collectively, a **"Prior Distribution"**), Salem shall be first obligated to make such advance up to a maximum amount equal to such Prior Distribution. Each such advance shall bear interest at the Advance Rate and shall be repaid in accordance with the priority set forth in **Section 4.**

Notwithstanding the foregoing, Salem shall not be obligated to advance any funds for capital improvements and/or working capital to the extent the need therefor is not reimbursed under the Florida Medicaid system and is due to (i) the negligence or misconduct of Res-Care or its employees and agents, (ii) a breach by Res-Care of its duties and obligations herein, or (iii) the Budget failed to adequately project the need for such funding advance by Salem, if such funding was reasonably foreseeable, and in all such cases, Res-Care shall be obligated to provide funds to cover such expense and, except in the case of funds required by **clause (iii)**, in no event shall funds advanced by Res-Care pursuant to this paragraph be considered a cash advance by Res-Care, nor shall Salem be required to repay such advance or pay interest thereon.

6.   **Term.** Unless earlier terminated in accordance with **Section 8** and/or **Section 33,** or further extended or agreed by the parties, the term (as may be extended, the **"Term"**) of this Agreement shall commence at 12:01 a.m. EST on December 1, 2013 and shall continue until 11:59 p.m. on November 30, 2018.  Unless either party gives the other party written notice of its election not to extend the Term at least one hundred eighty (180) days prior to the expiration of the then existing Term, the Term shall be automatically extended for up to four (4) additional periods of five (5) years each.  Notwithstanding anything to the contrary continued herein, the term of this Agreement shall not commence until such time as all necessary licensing or governmental approval has been obtained and the Closing, as such term is defined in that certain Acquisition Agreement by and between Salem, Res-Care and Salem Villages MRDD, Inc., has been completed.

7.    **Security Interest in Accounts Receivable; No Additional Indebtedness.** Salem shall execute a Security Agreement  and any and all necessary instruments, including any Financing Statements or other documents as shall be necessary in the discretion of Res-Care to grant it a first priority security interest in and to any accounts receivable relating to the Facilities, whether to be collected by Res-Care on behalf of Salem under this Agreement, or otherwise, for the purpose of securing the payment by Salem to Res-Care of its Management Fees, any advances made by Res-Care pursuant to **Section 5** and the Note Payable.  Salem agrees that except for the Note Payable, the Delinquent Note Payable and any advances by Res-Care hereunder, Salem shall not incur or assume any additional indebtedness without the prior written consent of Res-Care.

8.    **Default, Right to Cure and Termination.**

(a)    The following shall be deemed to be an "**Event of Default**" hereunder:

(i)    If Res-Care fails to maintain and operate the Facilities according to the standards established or imposed by all applicable laws and regulations and governmental agencies having jurisdiction or authority over the Facilities, other than by reason of failure of Salem to comply with its obligations thereunder or hereunder.

(ii)    If the certificates and authorizations for the Facilities to participate under the Florida Medicaid program are canceled or revoked because either party has failed to perform its obligations hereunder and such party is not, in good faith, diligently pursuing the reinstatement of such certificates and authorizations.

(iii)    If either party becomes insolvent or makes an assignment for the benefit of creditors or commits an act of bankruptcy or files a voluntary petition under the provisions of the United States Bankruptcy Code, including without limitation, a petition

18

for reorganization or arrangement or consents to an involuntary petition or is adjudicated a bankrupt.

(iv)   If either party violates, or is in breach of, any material term or condition of this Agreement.  For purposes of this paragraph (iv) the failure of Res-Care to use its respective best efforts to operate the Facilities in accordance with the provisions of the Budgets submitted to and approved by Salem shall be considered a breach of a material term of this Agreement.

(b)   Upon the occurrence of an Event of Default, the party not causing the Event of Default (the "**Non-Defaulting Party**") shall give the defaulting party (the "**Defaulting Party**") notice thereof and the Defaulting Party shall have, with respect to any monetary matter, ten (10) days to cure such default and in all other cases, thirty (30) days to cure such default; provided, however, if such default is not reasonably subject to cure within thirty (30) days, the Defaulting Party shall have such additional time as is reasonably necessary so long as, at all times, the Defaulting Party is acting with all reasonable diligence in attempting to effectuate a cure of such default; provided, further, if any such Event of Default relates to any necessary certification, authorization, permit or license needed for the operation of any Facility being suspended, revoked or subject to suspension of revocation, no such cure period shall extend beyond any applicable governmental deadline, including administrative appeals.

(c)   Upon termination of this Agreement for any reason other than (A) Res-Care causing an Event of Default, or (B) Res-Care's election not to extend this Agreement at the end of the original term or any renewal term, any outstanding Note Payable, accrued Management Fees and advances by Res-Care to Salem hereunder (collectively, "**Res-Care Obligations**") shall become due and payable within fifteen (15) days after submission to Salem of a calculation of such amounts.

19

(i)      Upon termination of this Agreement solely by reason of Res-Care's election not to extend this Agreement at the end of the original term or any renewal term, any accrued Management Fees and/or advances by Res-Care to Salem hereunder shall be payable by Salem to Res-Care in twenty-four (24) equal monthly installments, commencing thirty (30) days after the effective date of such termination, together with interest accruing from such effective date at the Advance Rate, payable monthly in arrears.

(ii)      Upon termination of this Agreement solely by reason of Res-Care's causing an Event of Default, any accrued Management Fees and/or advances by Res-Care to Salem hereunder shall be payable by Salem, together with interest accruing from the effective date of termination at a rate equal to the Advance Rate less one percent (1%) , as revenues from the Facilities are available, after payment of Costs of Operation, payment of any current Management Fees payable to  any successor to Res-Care hereunder (provided that such fees shall not exceed the amounts provided for in **Section 4(d)**), but before any payment of any other fees to any successor to Res-Care hereunder.   Additionally, upon an Event of Default caused by Res-Care, the security interest granted to Res-Care pursuant hereunder shall be automatically deemed null and void.

(iii)      Upon the earlier of (i) an Event of Default caused by Res-Care or (ii) after payment to Res-Care of all amounts to which it is entitled under this Agreement (including the Note Payable), the security interest granted in favor of Res-Care as described in **Section 7** shall be terminated and Res-Care and any other party thereto shall execute all documents or instruments as shall be reasonably necessary to reflect such termination.

(d)     In addition to Res-Care's rights under **paragraph (c)** of this **Section 8**, in the event of a termination of this Agreement as described in **Section 8 (c) (i)**, including but not limited to Salem's election to terminate this Agreement in accordance with **Section 6**, Res-Care or, notwithstanding the provision of **Section 21** to the contrary, its assign, shall have the option (**"Option"**), exercisable by written notice within thirty (30) days after the notification by Salem of the proposed termination of this Agreement, or in the case of an Event of Default caused by Salem, within thirty (30) days after the expiration of the ninety (90) day period described in **Section 8(b)**, to purchase Salem's entire right, title and interest in and to the Facilities, including but not limited to any rights relating thereto conferred by Florida or the federal government and Salem's right, title and interest in the Lease. The price at which Res-Care shall purchase and Salem shall sell, all of Salem's right, title and interest in the Facilities shall be the greater of: (i) fair market value (**"FMV"**) or (ii) the assumption of any and all liabilities and obligations of Salem associated with the Facilities (which shall expressly include Salem's obligations under the Lease and the Res-Care Obligations).   FMV shall be determined by an appraiser mutually agreeable to Res-Care and Salem. If Res-Care and Salem cannot agree on an appraiser each shall choose an independent appraiser experienced in valuing MRDD facilities in the State of Florida to determine FMV. Those appraisers shall choose a third appraiser with the FMV to be determined based on an average of the FMV as shown on each of the three appraisals. The parties hereby agree to equally share the costs of such appraisals and that the FMV as determined shall be final and binding.

(e)     In addition to the foregoing, upon an Event of Default, the Non-Defaulting Party shall be entitled to all remedies available at law or in equity, including, without limitation, specification performance and injunctive relief.

9.   **Insurance.**

(a)   Res-Care shall procure for Salem and maintain in full force and effect all insurance coverages required by the Lease. Res-Care shall provide Salem and Landlord with written evidence of such coverage. All such insurance to the extent appropriate will name Salem and Landlord, as co-insureds. Landlord's mortgagee, if any, shall be named an additional insured. The premiums for all insurance coverage which directly insures the risks of the Facilities shall be paid as part of the Costs of Operation. Salem and Res-Care hereby each waive any right or recovery against the other party for any claims that may be brought for any loss which is covered by fires and extended coverage insurance upon or relating to the Facilities and the furnishing and equipment thereon. This waiver of subrogation shall be valid and binding only in the event it is recognized and accepted by the fire and hazard insurance companies under policies obtained hereunder. Each party further agrees that its sole source of reimbursement of loss or damage related to risks which are covered by the insurance required by the Lease shall be the insurance proceeds of the policies to be provided hereunder and any reserves established under the Lease for self-insurance and that the other party shall not be liable for any damage or loss in excess of such insurance coverage or reserves for self-insurance.

Res-Care shall use its best efforts to (i) secure certificates of insurance for Salem and the Landlord, (ii) maintain the original of such policies at the office of Res-Care, (iii) deliver duplicate policies to Salem and the Landlord and (iv) procure endorsements thereto prohibiting any termination or cancellation thereof until the expiration of ten (10) days' written notice of cancellation to all named insureds.

(b)   Res-Care shall, to the extent financially reasonable in Res-Care's reasonable discretion, insure itself against normal business risks, inherent in its operation of the Facilities and shall, to the extent possible without increases in premiums unless said increases are

paid by Salem, cause Salem to be named as a co-insured, to the extent its interests appear, on the policies evidencing such insurance. As reasonably requested from time to time, Res-Care shall provide Salem written evidence that Res-Care is so insured.

10.   **Use of Premises.**  Res-Care shall not, without the prior written consent of Salem, at any time use, or permit any of the Facilities to be used, for purposes other than an ICF/DD facility in compliance with all applicable rules and regulations of Florida, and such other uses as may be outlined by Salem.

11.   **Amendment of Lease.**  Without Res-Care's prior written consent, Salem shall not terminate or agree to terminate the Lease and shall not amend the Lease unless such amendment (a) does not increase the rent payable thereunder, (b) does not increase the obligations of Salem thereunder, or (c) does not adversely affect the ability of Salem and Res-Care to operate the Facilities and render services to the clients of the Facilities.

12.   **Right to Inspect.**  At all reasonable times during regular business hours, and at any time outside regular business hours if prior telephonic notice during regular business hours is given to the Operational Vice President of Res-Care having jurisdiction over Florida, confirmed by email, Salem or its representatives shall have the right to inspect the buildings and premises comprising the Facilities, and the financial and other records (and to make copies of documents as appropriate and at Salem's expense) maintained by Res-Care at the Facilities in the performance of its services hereunder.

13.   **Books and Records.**  All books, records and reports prepared by Res-Care for or in connection with the development or management of the Facilities and maintained by Res-Care at any location other than the Facilities shall be available for inspection and copying by Salem at Salem's own expense and during normal business hours with prior written notice to Res-Care. It is agreed and understood that computer software and the users manuals for such software

developed or used by Res-Care in connection with the management of the Facilities shall not be considered "books, records and reports" as those terms are used in this **Section 13**, provided that printouts of data generated by use of such software shall be considered such "books, records and reports."

14.    **Cooperation at Termination.** Upon the expiration or earlier termination of this Agreement, the parties hereto shall cooperate fully with the other in effecting an orderly transition to avoid any interruption in the rendering of the above-described services and, in that connection, unless Res-Care shall exercise its option described in **Section 8(d)**, Res-Care shall surrender to Salem all keys, contracts, books, records and reports (as such term is defined in **Section 13**) maintained by Res-Care in connection with the management of the Facilities.

15.    **Covenant Not to Employ.**

(a)    The parties acknowledge that Res-Care, in the performance of its obligations hereunder, utilizes certain of its employees. Salem recognizes that Res-Care has incurred and will incur considerable time and expense in training Res-Care employees. For this reason, Salem covenants with Res-Care that if Res-Care's employment of any executive Res-Care employees shall terminate, or if this Agreement is terminated for any reason described in **Section 8(c)(i)**, Salem, or any of their respective affiliates shall not, for a period of one (1) year following the termination of this Agreement, employ any executive employee or encourage or permit any successor to Res-Care's duties hereunder to employ any executive employee for services rendered at or in connection with the Facilities or at any other ICF/DD facilities owned or operated by Salem, or its respective affiliates. This covenant shall not apply to:  (i) employees of Salem, or its affiliates who have not been previously employed by Res-Care or (ii) any person (including an administrator) working full time at a Facility. Recognizing that Res-Care would not have an adequate remedy at law in the event of any breach of this covenant, Salem agrees that

24

the covenant set forth herein may be enforced by Res-Care by an appropriate restraining order or other injunctive relief.

        (b)    Res-Care covenants with Salem that Res-Care shall not, during the Term or for a period of one (1) year thereafter, solicit or request that the Res-Care Executive Director or Business Manager assigned to the Salem operations transfer or be re-assigned to any other operations of Res-Care, without the prior written consent of Salem, which consent shall not be unreasonably withheld or delayed. Provided, however, following such time as a replacement has been hired and adequately trained, the preceding sentence shall not restrict Res-Care from transferring or re-assigning either such Executive Director or Business Manager if such individual has responded to a general posting of a job opening, Res-Care determines such individual is the best available candidate for the position posted and Res-Care has not uniquely or specifically solicited such individual for such position. Recognizing that Salem would not have an adequate remedy at law in the event of any breach of this covenant, Res-Care agrees that the covenant set forth herein may be enforced by Salem by an appropriate restraining order or other injunctive relief.

    16.    **Financial Reports.** Each party agrees, within fifteen (15) days after receipt thereof, to deliver to the other party a copy of the audited, reviewed or, as applicable, compiled financial statements of such party and any opinion with respect thereto issued by the independent certified public accountant preparing such statement.

    17.    **Indemnification.**

        (a)    Res-Care agrees to indemnify, reimburse, defend, and hold harmless Salem and Landlord from and against all demands, claims, actions or causes of action, assessments, losses, damages, liabilities, costs and expenses, including, without limitation, interest, penalties,  consequential damages, reasonable attorneys' fees, disbursement and

expenses, and reasonable consultants' fees, disbursements and expenses (but excluding internal overhead, administrative and similar costs of Salem), asserted against, resulting to, imposed on, or incurred by Salem or Landlord, directly or indirectly, in connection with any of the following occurring during the Term:  (a) any accident, injury to or death of persons or loss of or damage to property occurring on or about any Facility, including any claims of malpractice, (b) any use, misuse, nonuse, condition, maintenance or repair by Res-Care, (c) any ad valorem, employee withholding or sales taxes and (d) any failure on the part of Res-Care to perform or comply with any of the terms of this Agreement, except to the extent same are directly caused by Salem's gross negligence or willful misconduct.

(b)     Salem hereby agrees to indemnify, reimburse, defend and hold harmless Res-Care from and against all demands, claims, actions or causes of action, assessments, loss, damages, liabilities, costs and expenses, including, without limitation, interest, penalties, consequential damages, reasonable attorneys' fees, disbursement and expenses, and reasonable consultants' fees, disbursements and expenses (but excluding internal overhead, administrative and similar costs of Res-Care), asserted against, resulting to, imposed upon on, or incurred by Res-Care, directly or indirectly arising from Salem's gross negligence or willful misconduct in the exercise of its authority retained under this Agreement.

(c)     Notwithstanding the foregoing, each of Salem and Res-Care, for themselves and any insurance carrier, to the fullest extent possible, waive all claims of subrogation to the extent of any insurance coverage.

18.     **Litigation or Proceedings on Behalf of Salem.** If any claims or causes of action on behalf of Salem arise during the term of this Agreement, or if any claims, actions, or other legal proceedings arising from development or management of the Facilities are filed against Salem, Res-Care shall have the option, exercisable in its discretion, subject to Salem's prior

26

written consent, which consent shall not be unreasonably withheld, to institute or defend such claims, actions or other legal proceedings in Res-Care's name or Salem's name, as their respective interests may appear to be claimed, provided that Res-Care uses good faith efforts to proceed in a manner that is in the parties' respective best interests. The reasonable costs and expenses of prosecuting and defending such claims, actions, and legal proceedings shall be reimbursed to Res-Care by Salem as Costs of Operation, except as they relate directly to the independent acts of Res-Care taken outside the scope of the performance of its duties hereunder. Salem agrees to provide reasonable assistance to Res-Care in the prosecution and defense of such actions upon request by Res-Care. Unless Salem promptly and specifically in writing instructs Res-Care to the contrary, Salem further agrees that Res-Care shall have the right to select legal counsel to represent the interests of Salem in such claims, actions, and legal proceedings. Res-Care shall provide Salem with periodic reports regarding the progress of such proceedings.

19. **Compliance with Public Law 96-499.**

(a)     Pursuant to regulations promulgated by the Federal Health Care Financing Administration, an agency of the Department of Health and Human Services, implementing Section 952 of the Omnibus Reconciliation Act of 1980 (P.L. 96-499) conditioning Medicare reimbursement on the cost of services performed, insofar as this Agreement covers services valued at or costing Ten Thousand and 00/100 Dollars ($10,000.00) or more over a twelve (12) month period, the parties agree to provide the Secretary of Health and Human Resources, upon written request, or the Comptroller General, or their duly authorized representatives, access to this Agreement and the parties' books, documents and records necessary to verify the nature and extent of the cost of the services provided by the parties. Such access shall be provided until the expiration of four (4) years after the services are furnished under this Agreement.

(b)      If Res-Care carries out any duties of this Agreement through a subcontract with a value or cost of Ten Thousand and 00/100 Dollars ($10,000.00) or more over a twelve (12) month period with a related organization, Res-Care shall require in writing that the related organization shall make available, upon written request, to Salem and to the Secretary of Health and Human Resources, or the Comptroller General, or their duly authorized representatives, the said subcontract and the books, documents and records of the related organization that are necessary to verify the nature and extent of the costs of the services provided under the said subcontract. The subcontract shall require that such access shall be provided until the expiration of four (4) years after the services are furnished under the contract.

20.      **Health Insurance Portability and Accountability Act of 1996.**   In order to comply with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and regulations promulgated thereunder, including the Standards for Privacy of Individually Identifiable Health Information and the Security Standards for the Protection of Electronic Protected Health Information at 45 C.F.R. Parts 160 and 164 (collectively "**Privacy and Security Regulations**"), the parties agree to execute and deliver the Agreement attached hereto as **Schedule 20** on or before the Effective Date.

21.      **Parties Bound.** The provisions of this Agreement shall be binding upon the parties hereto and their respective successors and assigns. Except as specifically provided herein, no assignment of rights or delegation of duties shall relieve either party, as the case may be, of its obligations hereunder. Except as specifically provided herein, neither party may assign its rights or delegate its duties under this Agreement without the prior written consent of the other party; provided that a party may assign its rights and delegate its duties to any subsidiary or a successor entity in the event of a merger or a sale of substantially all of the party's assets, if the subsidiary

28

or successor entity assumes all of the party's obligations hereunder, and Salem may collaterally assign its rights and obligations under this Agreement to Landlord pursuant to the Lease.

22. **Attorneys' Fees.** In the event it becomes necessary for a Non-Defaulting Party to employ counsel to protect its interests, then the Non-Defaulting Party shall be entitled to receive from the Defaulting Party reasonable attorneys' fees for such services, plus all court costs and other expenses reasonably incurred in the enforcement of the obligations of this Agreement, and the Defaulting Party shall be liable for those sums and hereby agrees to pay such sums.

23. **Severability.** In the event any provision hereof shall be modified or held ineffective by any court in any respect, such adjudication shall not invalidate or render ineffective the balance of the provisions of this Agreement.

24. **Entire Agreement; Modification; Waiver.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and completely supersedes all prior oral agreements between the parties. All other agreements with respect to the subject matter hereof between the parties, whether written or oral, are merged herein. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by the parties hereto. No waiver of any of the provisions of this Agreement will be deemed, or will constitute a waiver of any other provision, whether or not similar, nor will any waver constitute a continuing waver. No waiver will be binding unless executed in writing by the party making the waver.

25. **Notices.** All notices, requests, demands and other communications required or permitted to be given or made under this Agreement shall be in writing and shall be deemed to have been given (i) on the date of delivery personally, (ii) on deposit in the United States mail, postage prepaid by registered or certified mail, return receipt requested, or (iii) on delivery to Federal Express or United Parcel Service, cost prepaid, for next day delivery, to the appropriate

party at the following addresses (or at such other address as shall hereafter be designated by any party to the other party by notice given in accordance with this Section):

| To Salem: | Lisbeth C. Evans<br>8 West Third Street, Suite M-7<br>Winston Salem, NC 27101 |
|---|---|
| With copy to: | George E. Hollodick<br>Blanco Tackabery & Matamoros, P.A.<br>110 South Stratford Road, Suite 500<br>Winston-Salem, NC 27104 |
| To Res-Care: | Pat Kelley<br>Chief Operating Officer, Res-Care, Inc.<br>9901 Linn Station Road<br>Louisville, KY 40223 |
| With a copy to: | Steve Reed<br>Chief Legal Officer, Res-Care, Inc.<br>9901 Linn Station Road<br>Louisville, KY 40223 |

26.    **Execution in Counterparts; Facsimile or Email Delivery.** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.  Signature by facsimile transmission or email of scanned .PDF copies shall be binding as though an original signature and the parties shall follow delivery of signature by facsimile or email with delivery of the original signature within a reasonable time.

27.    **Further Assurances.** The parties each hereby agree to execute and deliver all of the agreements, documents, and instruments required to be executed and delivered by them in this Agreement and to execute and deliver such additional instruments and documents and to take such additional actions as may reasonably be required from time to time in order to effectuate the transactions contemplated by this Agreement.

28.   **Exhibits.** The Exhibits attached hereto constitute a part of this Agreement and are incorporated herein by reference in their entirety as if fully set forth in this Agreement at the point where first mentioned herein.

29.   **Tense. Captions.** In construing this Agreement, whenever appropriate, the singular tense shall also be deemed to mean the plural, and vice-versa, and the captions contained in this Agreement shall be ignored.

30.   **No Third Party Rights.** Except as may otherwise be expressly provided herein, the provisions of this Agreement shall not entitle any person not a signatory hereto to any rights or reliance hereunder or in respect hereof, as a third party beneficiary or otherwise, it being the specific intention of the parties herein to preclude any and all such persons non-signatory hereto from such rights.

31.   **Governing Law.** This agreement shall be construed, interpreted, and enforced in accordance with the substantive laws of the State of Florida.

32.   **Survival.** The provisions of **Sections 8(c), 13, 14, 15, 17, 18, 19, 20, 22, 25, 27, 30 and 34** hereof shall survive the termination, for any reason, of this Agreement, in accordance with their respective terms.

33.   **Salem Termination Rights.**  Notwithstanding the foregoing in the event of (i) a sale by Salem and/or Landlord of its respective interest in any one or more Facilities (which may include all Facilities) to an individual or entity that is not an affiliate of Salem or Landlord, or (ii) the occurrence of an event of casualty or condemnation of any Facility such that such Facility is no longer operable and Landlord and Salem, in their discretion, elect not to reconstruct such Facility, from and after such date, such Facility (Facilities) shall be excluded hereafter.

In the event of a bona fide offer from a third party acceptable to Salem and/or Landlord to purchase any one or more Facilities from Salem and/or Landlord, Res-Care shall be given

31

notice within three (3) business days.  Res-Care shall then be given the opportunity to purchase on the same terms and conditions offered by the third party by giving Salem notice of its acceptance within fifteen (15) business days.  If Res-Care does not accept the offer or does not continue as manager of the Facilities, Res-Care shall cooperate with such party which shall succeed Salem as the operator of such Facility (Facilities).  Additionally, upon payment of the Res-Care Obligations, Res-Care shall execute such document and/or authorize the filing of such UCC Financing Statement requested by Salem in order to terminate any security interest in favor of Res-Care related to any asset of Salem (including accounts) used or generated in connection with such Facility (Facilities).

34.    **No Personal Liability.**  No officer, director, shareholder and/or employee of any party shall have any liability to the other party in the event of a default by any party hereto, notwithstanding any theory of law which allows "piercing the corporate veil."

35.    **Amend and Restate.**  The parties agree that this Agreement amends and restates in the entirety that certain Management Agreement between the parties executed on or about June 30, 2013.

36.    **Letter Agreement.**  Salem and Res-Care agree that that certain Letter Agreement between the parties dated June 27, 2013 is null and void and of no further force or effect.

**SEPARATE SIGNATURE PAGE FOLLOWS**

## SEPARATE SIGNATURE PAGE
## MANAGEMENT AGREEMENT

IN WITNESS WHEREOF the parties have executed this Agreement on the day and year set forth below, effective as of 12:01 a.m., December 1, 2013.

SALEM:

SALEM HOMES OF FLORIDA, INC.

By: _____
Its: President
Date: _____

RES-CARE:

RES-CARE, INC.

By: _____
Its:    Patrick Kelley, Chief Operating Officer

LANDLORD:

CLARK, EVANS & TATE, INC.

By: _____
Its: _____
Date: _____
[FOR PURPOSES OF SECTION 33 ONLY]

BTM:542316v4

## SEPARATE SIGNATURE PAGE
## MANAGEMENT AGREEMENT

IN WITNESS WHEREOF the parties have executed this Agreement on the day and year set forth below, effective as of 12:01 a.m., December 1, 2013.

SALEM:

SALEM HOMES OF FLORIDA, INC.

By: _____
Its: _____
Date: _____

RES-CARE:

RES-CARE, INC.

By: *Patrick Kelley* _____
Its:    Patrick Kelley, Chief Operating Officer

LANDLORD:

CLARK, EVANS & TATE, INC.

By: _____
Its: _____
Date: _____
[FOR PURPOSES OF SECTION 33 ONLY]

**Schedule 20**

**[Privacy and Security]**